

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-30-2006

# USA v. Gholson

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4666

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Gholson" (2006). *2006 Decisions.* Paper 1034.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1034

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 04-4666

———————

UNITED STATES OF AMERICA

v.

ELLIS GHOLSON,
                              Appellant

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Crim. 04-cr-00211
District Judge:  The Honorable Cynthia M. Rufe

———————

Submitted Under Third Circuit LAR 34.1(a)
February 10, 2006

———————

Before: SCIRICA, Chief Judge, BARRY and FISHER, Circuit Judges

———————

(Opinion Filed: May 30, 2006)

———————

OPINION

———————

BARRY, Circuit Judge

I.

In the early morning hours of November 9, 2003, Temple University Police

Officers Monica Hankins and Sharon Erickson were stationed at a "stand-by post" outside

White Hall, a campus dormitory on North Broad Street in Philadelphia, Pennsylvania. Officers stood guard at this location six days a week from 3 p.m to 3 a.m. because students had been robbed or shot by non-students in the area, including in front of White Hall.

At 1:25 a.m., the officers, from a distance of about 50-75 feet, observed Ellis Gholson standing on the stairs of White Hall, staring at the entrance. The officers thought he looked out of place. He appeared "disheveled," "dirty," and "dazed." (App. 30.) The officers then saw him extend his left hand towards a student who was exiting the dormitory, while keeping his right hand in his jacket pocket. The student saw Gholson, and immediately retreated into the dormitory.

Officer Hankins left the stand-by post and approached Gholson. As she drew closer, a second student exited the dormitory and exchanged words with Gholson. Again, Gholson had his left hand extended and his right hand firmly in his pocket. The second student moved away from Gholson and quickly left the White Hall area.

Officer Hankins asked Gholson if he was a Temple University student, and asked to see university identification.[1] Gholson ignored the Officer's requests, and walked past her onto North Broad Street. As this was happening, Officer Erickson left her police car, approached Gholson from his left side, and ordered him to stop and present identification. Gholson ignored her requests as well, and tried to run past her. Officer Erickson

---

[1] Under Temple University policy, employees and students are required to carry their university identification with them at all times.

attempted to stop Gholson by grabbing his left arm and shoulder. Following closely behind, Officer Hankins radioed for backup, and grabbed Gholson by his right arm and shoulder. A struggle ensued, and Gholson was placed against a wall that bordered the sidewalk. Officer Erickson was able to handcuff Gholson's left wrist, but he refused to remove his right hand from his jacket pocket. The pocket "appeared to be heavy." (App. 25.) As the three struggled, Gholson tried to turn the right side of his body towards Officer Hankins. The officers were able to force Gholson to the ground as a third officer arrived on the scene and assisted. Gholson finally removed his right hand from his pocket after one of the officers sprayed him in the face with mace. A pat-down search revealed a handgun in that pocket.

Gholson was arrested and charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The District Court denied his motion to suppress, finding that the officers had reasonable suspicion to stop him because he "fled from police after they observed suspicious activity in a high crime area." (App. 83.) Additionally, the Court concluded that the officers had reasonable suspicion to believe that he was armed and dangerous, and thus were justified in performing a pat-down, which resulted in the discovery of the weapon. Gholson entered a conditional guilty plea, and was sentenced to 57 months in prison. He appeals.[2]

## II.

---

[2] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

Gholson contends that, in violation of the Fourth Amendment, the officers illegally seized him and, as a result, the handgun found during the subsequent pat-down must be excluded from evidence. We disagree, and will affirm.[3]

The Fourth Amendment of the United States Constitution protects the "right of people to be secure in their persons . . . against unreasonable searches and seizures." When a police officer merely approaches an individual and questions him, a "seizure" of his person has not yet occurred, and therefore the Fourth Amendment is not implicated. *Florida v. Royer*, 460 U.S. 491, 497 (1983). Because no seizure has occurred, an individual approached in this way "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Id*. at 498. A Fourth Amendment "seizure" takes place when an officer has "in some way restrained the liberty of a citizen" by either "means of physical force, or show of authority." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). A seizure by physical force is effectuated by "the mere grasping or application of physical force with lawful authority." *California v. Hodari D.*, 499 U.S. 621, 624 (1991). A seizure by show of authority is completed when, under all of the circumstances, a reasonable person would have believed that he was "not free to decline the officers' requests or otherwise terminate the encounter," *Florida v. Bostick*, 501 U.S. 429, 439 (1991), and where the suspect actually submits to the show of

---

[3] In our review, we will not disturb the District Court's findings of fact unless clearly erroneous, and will review its legal conclusions de novo. *United States v. Coggins*, 986 F.2d 651, 654 (3d Cir. 1993).

4

authority.  *Hodari D.*, 499 U.S. at 626.

A seizure, in the usual case, must be justified by a warrant or probable cause. *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 147 (3d Cir. 2005).  If an officer, however, "has a reasonable, articulable suspicion that criminal activity is afoot," he or she may conduct a "brief, investigatory stop," i.e., a "*Terry* stop," in the absence of a warrant or probable cause.  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  "The test is one of reasonableness given the totality of the circumstances, which can include [the defendant's] location, a history of crime in the area, [the defendant's] nervous behavior and evasiveness, and [the officer's] 'commonsense judgments and inferences about human behavior.'"  *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (quoting *Wardlow*, 528 U.S. at 124-25).

The Supreme Court has said that certain behaviors are, in and of themselves, insufficient to provide an officer with reasonable suspicion to stop.  One's mere presence in a high crime area, *Brown v. Texas*, 443 U.S. 47, 52 (1979), or refusal to cooperate with police, *Florida v. Bostick*, 501 U.S. 429, 437 (1991), or unprovoked flight, *Wardlow*, 528 U.S. at 125-26, are, without more, not enough to justify a *Terry* stop.  Presence in a high crime area, *plus* unprovoked flight, or some other indicia of wrongdoing, however, can give rise to reasonable suspicion.  *Wardlow*, 528 U.S. at 125-26.  In *Wardlow*, the Supreme Court found that reasonable suspicion existed where a defendant, who was in an area known for a high volume of narcotics trafficking, was holding a bag and fled the scene upon seeing police officers.  *Id*. at 121-22.

5

Here, the officers had reason to suspect criminal activity at least as early as when Officer Erickson grabbed Gholson's left shoulder and arm as he was attempting to flee from the officers after refusing to identify himself. His appearance was disheveled and his behavior curious, behavior similar to that Officer Erikson, at least, had investigated in prior campus crimes in this high crime area where students were robbed after being asked for money or directions.[4] (App. 64.)

Officers must be permitted to "'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" *Johnson*, 332 F.3d at 206 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Here, given the totality of the circumstances, the officers made the common sense judgment that criminal activity was afoot. Gholson's seizure did not violate the Fourth Amendment.

The officers were also justified in searching Gholson for a weapon. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may frisk the suspect "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

---

[4] Gholson argues that there is no factual basis to support the officers' suspicion that he was committing a robbery. But Gholson did not have to be committing a robbery in order for the officers to have reasonable suspicion to believe that he was. As the Supreme Court explained in *Wardlow*, "sometimes behavior giving rise to reasonable suspicion is entirely innocent," and it is an "accepted . . . risk that officers may stop innocent people." 528 U.S. at 130 n.4.

Here, the officers observed Gholson keep his right hand in his jacket pocket during his interaction with the two students on the dormitory steps.  Gholson refused to remove his hand from the pocket when the officers demanded that he do.  Officer Hankins "physically could tell" that the "pocket appeared to be heavy."  (App. 25.)  During the struggle with the officers, Gholson attempted to move the right side of his body, with his hand in the pocket, towards Officer Hankins.  The officers had every reason to believe that Gholson was concealing a weapon in the pocket.  It was eminently reasonable to conduct the pat-down that revealed the handgun.

### III.

The judgment of sentence will be affirmed.